## The Empire Transportation Co. *versus* Wallace.

1. In the absence of special contract, the obligation of a carrier of goods is to transport them by the usual route proposed by him to the public, and to deliver them within a reasonable time.

2. This, whether by the route of his own carriage or extended to points beyond.

3. He must use reasonable expedition, but is not bound to use extraordinary exertions or extra expense to surmount obstacles not caused by his own default, but by the weather, or other act of Providence.

4. The established route of a carrier was by rail to Philadelphia, and by water to Boston. He was not bound to send goods by rail from Philadelphia when there was an obstruction in the water communication.

March 30th 1871. Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ. WILLIAMS, J., at Nisi Prius.

Error to the Court of Common Pleas of *Warren county:* No. 347, to January Term 1871.

This was an action of assumpsit, commenced July 24th 1868, by Alexander Wallace against the Empire Transportation Company, for damages on account of the company defendants having failed to deliver a quantity of petroleum according to the contract in three bills of lading, one for 118 barrels, one for 58 barrels and one for 60 barrels. The bills of lading were similar.

The first was :—

"Received, Irvineton, December 19th 1865, of Alex. Wallace 118 barrels, said to contain crude oil, and marked A. Wallace, to be transported to Barney, Spencer & West, at Boston, at $1.35 (freight for this and connecting companies or agents) per 100 pounds, subject to the following conditions and agreement."

Amongst the conditions of the bill of lading were these :—

"2. This merchandise may be carried in box cars, covered skeleton cars, or on open platform cars; if destined beyond Philadelphia, it may be transported by water in vessels, boats, barges or lighters, and if so destined to any point beyond, the same may be intrusted or delivered in the cars of this company, or otherwise to any other railroad or transportation company or agent; and such railroad or transportation company or agent so selected, shall be regarded exclusively as the agent of the owner or consignee, and shall be entitled to the benefit of the conditions and

provisions of this, and of such bill of lading as they may deliver therefor; and the Empire Transportation Company shall not be, in any event, responsible for the negligence or non-performance of any such company or agent, nor shall such company or agent be liable for any loss or injury except upon its or their respective routes, and while such merchandise is in their respective custody.

"3. That the owner or consignee (in consideration of the extremely hazardous nature of such merchandise, which is not covered by any extra charge for transportation) hereby assumes all risk from leakage, evaporation and loss by fire, while in transit, or at depots, or in stations, or on board boats, vessels or lighters, from any cause whatever, and all dangers and delays of railroad and water transportation to point of destination, and in any claim or demand, suit at law or equity, against this company or transportation company or agent, for loss or damage thereby, this bill of lading shall be deemed and taken as a release in full therefor."

Barney, one of the consignee firm, testified: "The crude oil was consigned to our firm of Barney, Spencer & West at Boston aforesaid, to be sold on Mr. Wallace's account. The bills of lading were received about January 1st, 1866. We did not receive oil from Mr. Wallace in December. Our firm found it at Philadelphia on or about the 25th of January 1866, Mr. Spencer of the firm being sent on to look it up, the oil not coming to hand and we being anxious to get it. At that time we were paying $1 per barrel for freight by steamer from Philadelphia to Boston. We were not receiving any by rail. The time by water was from fifty to sixty hours. I made sales from 43 to 45 cents per gallon, which was the market price; about the 1st of February, when I understand the sale was made in Philadelphia, the price in Boston was from 35 to 37 cents per gallon. It was a declining market, and commenced about the middle of January, and continued until after the 1st of May."

Spencer, another of the firm, testified: "Oil shipped to our firm from Irvineton, took from fifteen to eighteen days to reach us, which was the usual and ordinary time between the places. I found the oil on the 23d day of January 1866, at Point Breeze, below Philadelphia. I went for the purpose of finding this oil. It was in defendants' warehouse there. The reason given why the oil had not been forwarded, was that when the oil arrived in Philadelphia the river was closed by ice. It was delivered at the station of the Pennsylvania Railroad Company at West Philadelphia about January 26th—in that vicinity. I received it then because the loss by leakage while waiting for the river to open would be so great. There was direct railroad communication then between Philadelphia and Boston. I sold it in Philadelphia and did not ship it to Boston, because the river was closed, and it would have been very expensive to have it sent by rail from there.

[*Empire Transportation Co. v. Wallace.*]

It was sold February 2d. It occupied from two or four weeks by water. We sold oil for plaintiff previously; it came by the New York Central Railroad. The rate of freight by the defendants' line was $1 per barrel in excess of the New York Central Railroad Company's rates, between December 1865 and January 6th 1866. The oil was stored by the defendants at Point Breeze, and no notice was given to us, so we might go and take care of it."

William G. Warden, the agent of defendants, testified: "We received, on the 28th and 29th days of December, 1865, 236 barrels of crude petroleum, to be shipped to Barney, Spencer & West, of Boston. Philadelphia being the terminus of the rail route of Empire Line, defendant, the means of transportation from that point were by water to Boston, and the Empire Line was not carrying oil any further than Philadelphia by this route. I tried to get vessels while the oil was in the custody of the company, but could not succeed on account of ice in the harbor."

The following are points of the defendants with their answers:—

"4. Under the bill of lading in evidence, defendants had the right to ship the goods by water from Philadelphia, and were not bound, if they found the river frozen over, to incur extra expense to forward them by another route.

"Answered in the negative as in our general charge.

"4. If the jury believe that defendants were prevented or delayed from carrying the goods, by the river at Philadelphia being frozen, so that it was impossible to forward them by water, that being the ordinary route of defendants, plaintiff cannot recover.

"For answer to this we refer to our general charge."

The court (Vincent J.) charged:—

"The defendant is a common carrier and therefore liable for the loss of goods in transit by it, not caused by the act of God or the public enemy, unless this common-law liability is restricted or changed by the contract of the parties. The goods mentioned in the bills of lading in evidence were never delivered at Boston, the place of consignment, but were in fact received by the consignees in Philadelphia, and this relieved the defendant of his obligation to deliver them at Boston. In the absence of evidence to the contrary the presumption is that the consignees received the packages of oil in good order and if there was a deficiency from leakage, or evaporation, the defendant is not liable therefor unless caused by gross negligence, of which there is no evidence.

["By the contract made in regard to these goods the defendants had a right to transport the goods beyond Philadelphia by water, but it did not restrict itself to that mode of transportation. The second clause in the conditions in the contract shows plainly in our opinion that another mode of transportation was contemplated by the company, for it provides that if the goods are delivered to another *railroad* company it shall become the agent

of the owner or consignee, and the defendant was not to be liable for its neglect. The plaintiff then, in our opinion, had a right to suppose that the oil would be delivered in Boston without unnecessary delay, and that if it could not be delivered by water, it would be sent by rail.] [The evidence shows that the defendant never delivered the oil to any other railroad or transportation company but retained it in its own possession, and it is therefore liable for any loss that has accrued to the plaintiff by any undue or unnecessary delay in the transportation of the oil to Boston.] If the river was not frozen up so as to prevent vessels from leaving for some six to eight days after the arrival of the oil at Philadelphia, was it negligence in the defendants not to send it forward? If it was, the consequent loss to the plaintiff must fall upon the defendant, for in our opinion the defendant was bound to send the oil forward if it could have been sent by water after it arrived at Philadelphia, before the river was closed by ice.

["The evidence is that oil could ordinarily be taken from Philadelphia to Boston by water in from fifty to sixty hours, and from Irvineton to Boston in from fifteen to eighteen days. This oil reached Philadelphia in eight or nine days from Irvineton, which left the defendant from seven to ten days to get it to Boston within the ordinary time. It was still in Philadelphia on the 26th of January, and according to all the evidence no effort had been made to send it forward by rail, nor had any notice been given to the consignees that it was delayed by ice in the Delaware.] We cannot so construe the contract in this case as to instruct you that the defendant was not bound to send the oil to Boston until it could send it by water from Philadelphia. Nor are we able to see why the defendant is not liable for any loss the plaintiff has sustained by its neglect because the plaintiff's consignees received the oil in Philadelphia if, at the time it was so received, a loss had accrued caused by that neglect, and whether a loss had thus accrued from that cause is a question of fact for you. If oil had not fallen in price up to the time this oil ought to have been delivered in Boston, the plaintiff has sustained no damage at the hands of defendant. If it did fall in price before it was delivered to the plaintiff's consignees, involving a loss to the plaintiff by the neglect of the defendants, it is liable for the loss so sustained by the plaintiff." * * *

The verdict was for the plaintiff for $705.10.

The defendants removed the case to the Supreme Court and assigned for error the answers to points and the part of the charge in brackets.

*J. R. Clark*, for plaintiffs in error.—Carriers may limit their liability by their bills of lading: Farnham *v.* C. & A. R. R., 5 P. F. Smith 59. In the absence of any special contract the

18 P. F. SMITH—20

[Empire Transportation Co. v. Wallace.]

obligation of a carrier of goods is to carry them by the usual route professed by him to the public, and to deliver them within a reasonable time: Redfield on Carriers, §§ 210, 220, 221. If it be his usual course of business to forward goods beyond his route by sailing vessels, he is not liable for not forwarding a particular article by steam-vessels, unless the direction to do so be clear and unambiguous: Id. § 182. And he is not bound to use any extraordinary efforts, or incur extra expense in order to surmount obstacles caused by the act of God, as a fall of snow: Id. § 305.

Testimony may be introduced to show the real contract under a bill of lading: The Balt. & P. Steamboat Co. *v.* Brown, 4 P. F. Smith 77; Angell on Carriers, § 179.

*R. Brown,* for defendant in error.—Contracts limiting a carrier's liability are strictly construed: In The Schooner Reeside, 2 Sumner 267; Angell on Carriers, § 226, a; Chouteaux *v.* Leech & Co., 6 Harris 224. His liability is not measured merely by the terms of the contract, but also by the law applicable to common carriers: Angell on Carriers, § 226, note a. Parol evidence to vary its terms is not admissible: Id. § 228, note a; B. & P. Steamboat Co. *v.* Brown, 4 P. F. Smith 77; Peters *v.* Rylands, 8 Harris 497; Warden *v.* Greer, 6 Watts 424.

The opinion of the court was delivered, May 8th 1871, by

SHARSWOOD, J.—It is well settled elementary law, that in the absence of any special contract the obligation of a carrier of goods is to transport them by the usual route proposed by him to the public, and to deliver them within a reasonable time. This rule applies as well where he confines his undertaking to the route of his own carriage as where he extends it to forward goods to points beyond. He must use reasonable expedition, but is not bound to extraordinary exertions or to incur extra expense in order to surmount obstacles not caused by his own default, but by the weather or other act of Providence: Redfield on Carriers, §§ 210, 220, 302, 304, 305.

The contract between the parties in this suit was contained in the bill of lading as it is termed, or receipt for transportation. It did not by any special stipulations vary the extent of the legal obligations resting upon the carriers receiving goods to be transported to Boston, a point beyond their own line. It fully appeared that the established route of the defendants below was by railroad to Philadelphia, and from thence by water to Boston. It is true the transportation company were not absolutely bound to this route beyond Philadelphia. They had the option to send the goods forward, either by water in vessels, boats, barges or lighters, or by any railroad or transportation company or agent. There was certainly nothing in this option to render it incumbent upon the

[Empire Transportation Co. *v.* Wallace.]

carriers to send the goods by railroad whenever there was any obstruction of the communication by water. There is nothing in it which gave the plaintiff any right to suppose that the goods would be delivered in Boston without any unnecessary delay, and that if they could not be immediately sent on by water, they would be sent by rail. Obstructions by ice in the river are in their nature merely temporary, and of very uncertain duration. They rarely last longer than one or two weeks, and the ice may break up and disappear so as to reopen navigation in twenty-four hours. It had been expressly stipulated that the owner or consignee should assume all risk from dangers and delays of railroad and water transportation to point of destination. The defendants below were not bound to incur the extraordinary expenses of sending the oil on by railroad, because it happened that the Delaware river was so obstructed by ice at or immediately.after the article arrived in Philadelphia as to prevent their obtaining vessels for the purpose. That this expense would have been extraordinary appeared by the testimony of Henry F. Spencer, a witness whose deposition was taken on behalf of the plaintiff below and read by him on the trial, who by the plaintiff's authority, received the oil at Philadelphia from the hands of the defendants below. He said: "I sold it in Philadelphia, and did not ship it to Boston, because the river was closed, and it would have been very expensive to have sent it by rail from there." It was very properly submitted by the learned judge below to the jury, to say as a question of fact, whether there was negligence causing unnecessary delay, in the company not sending the oil forward as soon as possible after its arrival in Philadelphia, if the river was not frozen up so as to prevent vessels from leaving for some six to eight days after that. Had the learned judge rested there it would have been perfectly right, for there certainly was evidence sufficient to justify that submission. But after thus submitting this question, the learned judge went much further, and in effect took the case back from the jury, when in his answers to the points, and in his charge, he instructed them that if the defendants could not for any providential reason beyond their control send on the merchandise by water they were bound to send it by railroad, and that not having done so, they were responsible to the plaintiff for the loss he had sustained by the fall in the market during the delay. In this we think there was error.

Judgment reversed, and *venire facias de novo* awarded.